IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BEVERLY HACEESA, Individually, and as
Co-Personal Representative of the Estate of Hardy
Haceesa, and FIRST FINANCIAL TRUST
COMPANY, As Conservator for SHENOEL
HACEESA, A Minor, and Co-Personal
Representative of the Estate of Hardy Haceesa,

        Plaintiffs,

vs.                                         No. CIV 99-193 MV/RLP

SAN JUAN REGIONAL MEDICAL CENTER,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment, filed January 28, 2000 [Doc. No. 20]. The Court, having considered the motion, response, reply, relevant law, and being otherwise fully informed, finds that the motion is well taken in part and will be **granted in part and denied in part**.

### BACKGROUND

This case involves the death of Hardy Haceesa from Hantavirus Pulmonary Syndrome ("hantavirus") on April 28, 1998. Plaintiffs – Mr. Haceesa's wife, his child's conservator, and the representatives of his estate – bring claims against Defendant San Juan Regional Medical Center ("SJRMC") under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. Plaintiffs complain that Defendant allegedly failed to provide an appropriate medical

1

screening to Mr. Haceesa on April 27 and 28, 1998, discharged Mr. Haceesa without ensuring that his medical condition had been adequately stabilized and without informing the Haceesas of the risks Mr. Haceesa faced, and attempted to make what Plaintiffs complain was an inappropriate transfer to another medical facility.

For the purpose of resolving this motion, the Court finds that the following are the undisputed material facts:[1]

1. On April 25, 1998, Hardy Haceesa was seen in the emergency room at Northern Navajo Medical Center and diagnosed with bronchitis. He was discharged from the emergency room and placed on Erythromycin to treat the diagnosed bronchitis.

2. On April 27, 1998, at 6:00 a.m., Mr. Haceesa presented to the emergency room at SJRMC. Since being seen at Northern Navajo Medical Center on April 25, Mr. Haceesa had developed increased abdominal pain with cramping, vomiting, and diarrhea. He first met with a nurse, Phyllis Walden, who took an initial history from Mr. and Mrs. Haceesa and was then seen by Dr. Russell Hill who oversaw Mr. Haceesa's care on April 27.

3. At all relevant times, a standard part of the screening conducted by emergency room nurses at SJRMC included recording in a patient's medical history any reported history of exposure to mouse droppings or exposure to a building where deer mice were present.

---

[1]The Court accepts as undisputed all facts admitted by both parties and all facts for which no competent contrary evidence has been presented by the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Mere assertions that a fact is or is not controverted are insufficient. *Id.*

4. It was common knowledge among the professional staff at SJRMC at the time Mr. Haceesa came to the emergency room that if a patient had flu-like symptoms combined with an exposure to deer mice, he or she might have contracted hantavirus.

5. During April 1998, Defendant had entered into a contract with the United States Department of Health and Human Services that provided that SJRMC would be paid for medical services provided to Native American patients.

6. Dr. Hill performed an assessment of Mr. Haceesa's condition and ordered laboratory studies including complete blood counts, pro-seven, and liver and amylase profiles. Based on the results of his physical examination and review of the laboratory results, Dr. Hill diagnosed Mr. Haceesa as having a viral syndrome, most likely hepatitis. Dr. Hill ordered a hepatitis profile. Dr. Hill did not treat Mr. Haceesa differently from other patients with similar symptoms. He concluded that Mr. Haceesa's condition was stable and discharged him from the SJRMC emergency room on April 27.

7. Mr. Haceesa returned to the SJRMC emergency room at approximately 7:11 a.m. on April 28, 1998 and Dr. Hill was again the physician who initially treated Mr. Haceesa. The patient reported that his nausea and vomiting had improved, but that he had a lot of diarrhea, his thighs were cramping, and he had blurry vision. Mr. Haceesa felt weak and still had abdominal pain associated with the vomiting and diarrhea. Dr. Hill assessed the patient's condition and concluded that he did not have an emergency medical condition.

8. Dr. Hill discussed with Dr. Bower at the Northern Navajo Medical Center transferring Mr. Haceesa from SJRMC to the Northern Navajo Medical Center.

9. On the morning of April 28, 1998, a nurse suggested to Mr. and Mrs. Haceesa that they would be more comfortable leaving SJRMC and going to Shiprock "due to insurance." At this time, Mr. Haceesa was hooked up to an IV and oxygen. Ms. Larkin, the emergency room nurse, noted on Mr. Haceesa's chart at 8:50 a.m. that he would be transferred to the Northern Navajo Medical Center by private vehicle. The nurse felt that he needed to be admitted to a hospital because of his medical condition. As Mr. Haceesa's condition continued to worsen the morning of April 28, it became obvious that he could not be transferred without advanced life care services.

10. At some point on the morning of April 28, 1998 Dr. Stradling took over the care of Mr. Haceesa from Dr. Hill.

11. Mr. Haceesa's medical condition deteriorated substantially that morning, requiring admission to the intensive care unit at SJRMC. Because his condition deteriorated, the transport of Mr. Haceesa to Northern Navajo Medical Center was canceled.

12. When Mr. Haceesa was transferred to the intensive care unit, Donna Mitchell, a nurse, took Mr. Haceesa's history from Mrs. Haceesa. Mrs. Haceesa told Ms. Mitchell that the previous week her husband had cleaned out a trailer where there may have been mice. Ms. Mitchell noted this and reported it to Dr. Abbott.

13. Mr. Haceesa's condition was stabilized as much as possible in the intensive care unit at SJRMC and he was then transported to the University of New Mexico Hospital via helicopter.

14. Mr. Haceesa died from hantavirus while en route to the University of New Mexico Hospital.

**STANDARD OF REVIEW**

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the non-moving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States*, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322.

**DISCUSSION**

**A. Medical Screening**

The EMTALA provides,

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists.

42 U.S.C. § 1395dd(a). Plaintiffs complain that Defendant violated this requirement by failing to conduct an appropriate medical screening of Mr. Haceesa on April 27 and 28. Defendant moves for summary judgment as to this claim, arguing that Plaintiffs essentially seek to bring a malpractice claim under the EMTALA which is impermissible and that there is no genuine dispute of material fact regarding whether Mr. Haceesa was screened differently from other patients presenting similar symptoms.

Courts in several circuits, including the Tenth Circuit, have made clear that EMTALA is not a federal malpractice or negligence statute, but rather was intended to prevent "patient dumping" – the practice of refusing to provide medical care for patients who are unable to pay for their treatment. *See Repp. v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (10th Cir. 1994) ("section 1395dd(a) precludes the adoption of a standard tantamount to a federal malpractice statute") (citing cases); *Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir. 1998) ("an EMTALA 'appropriate medical screening examination' is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms"); *Summers v. Baptist Med. Center Arkadelphia*, 91 F.3d 1132, 1136-37 (8th Cir. 1996)

(en banc); *Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996); *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255, 1258 (9th Cir. 1995). As explained by one court, "[t]he Act is intended not to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances." *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991).[2] Accordingly, the Tenth Circuit has held that a hospital violates the medical screening provision in EMTALA when it fails to follow its own standard screening procedures. *Repp*, 43 F.3d at 522. Moreover, a plaintiff may state a claim for improper medical screening in violation of EMTALA by showing that she or he was treated differently than other patients with similar symptoms. *Marshall*, 134 F.3d at 323-24 (citing cases); *Summers*, 91 F.3d at 1138; *Vickers*, 78 F.3d at 144.

The Court now turns to apply these standards to the case at bar. Defendant argues that Dr. Hill's treatment of Mr. Haceesa cannot be seen as a screening violation under EMTALA because he treated Mr. Haceesa the same as other patients with similar symptoms and because such a claim is essentially a medical malpractice claim which cannot be brought under EMTALA. Defendant reasons that Plaintiffs' own expert witnesses testified that Dr. Hill had the necessary information to diagnose

---

[2]Though the District of Columbia, Sixth, Eighth, Tenth, and Eleventh Circuits have held that EMTALA does not impose a substantive national standard of care, the First, Fifth, and Ninth Circuits have imposed a minimum screening standard under EMTALA. *See* Michael J. Frank, *Tailoring EMTALA to Better Protect the Indigent: The Supreme Court Precludes One Method of Salvaging a Statute Gone Awry*, 3 DEPAUL J. HEALTH CARE L. 195, 206-08 (2000). The Fourth Circuit has developed a type of burden shifting system modeled after the system developed for employment discrimination cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See id.* at 209-10.

7

Mr. Haceesa as having hantavirus. Therefore, Defendant asserts, the issue raised by Plaintiffs is one of misdiagnosis which is covered by state malpractice law – not EMTALA. Defendant is correct that determining after the fact that a doctor misdiagnosed a patient is not sufficient to state an EMTALA claim. As the Fourth Circuit explained, "[a]nalysis by hindsight . . . is not sufficient to impose liability under EMTALA. . . . Instead a hospital must actually perceive the seriousness of the medical condition and nevertheless fail to act to stabilize it." *Vickers*, 78 F.3d at 145 (quoting *Baber v. Hosp. Corp. of America*, 977 F.2d 872 (4th Cir. 1992)). The Fifth Circuit has similarly explained,

> If the hospital provided an appropriate medical screening examination, it is not liable under EMTALA even if the physician who performed the examination made a misdiagnosis that could subject him and his employer to liability in a medical malpractice action brought under state law.

*Marshall*, 134 F.3d at 322 (citing cases).

To state an EMTALA claim for improper screening, Plaintiffs must present evidence that SJRMC failed to treat Mr. Haceesa in accordance with SJRMC's standard protocol or differently than other patients with similar symptoms. Though Plaintiffs do not present such evidence as to Dr. Hill, Plaintiffs' screening claim survives because they have presented evidence that the emergency room nurses at SJRMC failed to follow the hospital's standard protocol by recording Mr. Haceesa's possible exposure to deer mice in his medial history. Mrs. Haceesa asserts in her affidavit that she told the emergency room nurses who took Mr. Haceesa's history on April 27 and 28 and Ms. Mitchell – the nurse who cared for Mr. Haceesa once he was admitted into the hospital, that she was concerned that Mr. Haceesa might have hantavirus because he had entered a trailer where there were mice. The two emergency room nurses deny that the Haceesas reported possible exposure to hantavirus. The nurse in the intensive care unit, Ms. Mitchell, on the other hand, stated in her affidavit

8

that Mrs. Haceesa did express this concern to her, she noted it in Mr. Haceesa's medial history, and relayed the information to Dr. Abbott. Plaintiff asserts that there is a dispute of material fact regarding whether the SJRMC staff properly screened Mr. Haceesa as required by EMTALA because there is a dispute regarding whether the staff was told of Mr. Haceesa's possible exposure to hantavirus and recorded this information as is standard hospital protocol.

Defendant argues that this dispute of fact is immaterial because Plaintiffs' own experts have already testified that the hospital staff had sufficient information to diagnose Mr. Haceesa as having hantavirus, but failed to do so. Therefore, whether the nurses failed to properly record the patient's exposure history is irrelevant. Defendants argue, once again, that Plaintiffs are wrongly trying to fashion a standard malpractice claim into an EMTALA claim.

The Court does not find this argument persuasive. That the hospital staff had sufficient information to know that Mr. Haceesa had hantavirus, but failed to make this diagnosis – a malpractice-type issue, does not mean that the hospital did not also fail to properly screen Mr. Haceesa by failing to record the alleged statements that he may have been exposed to the hantavirus. That Defendant made one mistake which was not relevant under EMTALA, does not render a possible second mistake similarly irrelevant to Plaintiffs' EMTALA claim. The fact remains that EMTALA provides a private right of action for an emergency room's failure to properly screen a patient by failing to follow its own screening protocol, *see Repp*, 43 F.3d at 522, and there is a dispute of material fact as to whether the SJRMC staff failed to follow the proper screening procedures. As one Court of Appeals has explained, "any departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act. The motive for such departure is not important to this analysis." *Gatewood*, 933 F.3d at 1041. Though the Tenth

9

Circuit has held that mere *de minimus* variations from a hospital's standard screening procedures are not sufficient to impose EMTALA liability, *Repp*, 43 F.3d at 523, the Court finds that this is not such a case. If the Haceesas did in fact alert the emergency room nurses to Mr. Haceesa's possible exposure to deer mice, and the nurses had recorded it, Mr. Haceesa might have been diagnosed more promptly with hantavirus. Therefore, there is a genuine dispute regarding whether SJRMC followed its standard protocol in treating Mr. Haceesa and the Court will deny Defendant's motion for summary judgment as to Plaintiffs' screening claim under EMTALA.

### B. Failure to Stabilize Before Discharging on April 27

Plaintiffs claim that SJRMC discharged Mr. Haceesa on April 27 "without first ensuring that the emergency medical condition he had was adequately stabilized, and without informing [Mr.and Mrs. Haceesa] of the risks he faced as a result of his condition." *Complaint*, at ¶ 23. Under EMTALA, a hospital is required to stabilize a patient who has an emergency medical condition. The relevant portion of the act provides:

> If any individual comes to a hospital and the hospital determines that the individual has an emergency medical condition the hospital must provide either—
>
> > (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> >
> > (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1).[3]

---

[3]EMTALA defines an "emergency medical condition" as:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

The parties dispute whether Mr. Haceesa was suffering from an emergency medical condition when he was released from SJRMC on April 27, 1998. Defendant asserts his condition was stable and that Plaintiffs' claim for failure to stabilize must fail because according to the undisputed facts Dr. Hill did not know Mr. Haceesa had an emergency medical condition at the time he discharged Mr. Haceesa on April 27. Plaintiffs fail to make any legal argument supporting this failure to stabilize claim. They do attach an affidavit of Dr. Robert C. Henry who testified that the results of the tests ordered by Dr. Hill on Mr. Haceesa indicated that Mr. Haceesa was suffering from hantavirus.[4] According to Dr. Henry, Dr. Hill should have ordered the hantavirus test and admitted Mr. Haceesa into an intensive care unit. However, under EMTALA, the relevant inquiry is not whether the patient in fact had an emergency medical condition, but whether the medical care professionals knew the patient had such a condition. *See Urban v. King*, 43 F.3d 523, 526 (10th Cir. 1994). The Tenth Circuit has held that to establish a violation of the stabilization and transfer provision of EMTALA, a plaintiff must show that the hospital had actual knowledge of the patient's emergency medical condition. *See id*. Bound as this Court is to follow Tenth Circuit case law, the Court must grant summary judgment as to Plaintiffs' claim that SJRMC improperly discharged Mr. Haceesa without stabilizing him on April 27 because Plaintiffs present no evidence that the SJRMC staff knew he suffered from an emergency medical condition. Defendant has presented evidence that Dr. Hill did not know Mr. Haceesa was suffering from an emergency medical condition, and Plaintiffs have failed

---

(i) placing the health of the individual . . . in serious jeopardy,
(ii) serious impairment to bodily functions, or
(iii) serious dysfunction of any bodily organ or part. 42 U.S.C. § 1395dd(e)(1).

[4]Mr. Haceesa had a profound thrombocytopenia less than half of normal and a marked bandemia of 19 percent, high normal being 10 percent which, according to Dr. Henry, ate indicators of hantavirus.

11

to come forward with evidence creating a genuine dispute on this issue of the hospital's actual knowledge. For example, Plaintiffs do not even indicate when Dr. Hill received the test results which Dr. Henry indicated should have alerted Dr. Hill to Mr. Haceesa's hantavirus. Therefore, the Court cannot conclude that Dr. Hill had information indicating that the patient had hantavirus. Accordingly, there is no genuine dispute about whether Defendant had actual knowledge that Mr. Haceesa was suffering from an emergency medical condition – a required element of an EMTALA claim for failure to stabilize, and the Court will grant summary judgment as to this claim.

### C. Planned Transfer on April 28

Plaintiffs charge that Defendant violated EMTALA, 42 U.S.C. § 1395dd(b)(1), by "its attempts to make an inappropriate transfer of [Mr. Haceesa] to Northern New Mexico Navajo Hospital on April 28, 1998." *Complaint*, at ¶ 38. Plaintiffs assert that on the morning of April 28, Defendant had actual knowledge that Mr. Haceesa suffered from an emergency medical condition, but still made plans to transfer him to Northern New Mexico Navajo Hospital. Defendant argues that summary judgment should be granted as to this claim both because SJRMC properly canceled the transfer once Mr. Haceesa's condition deteriorated and because EMTALA imposes liability not for attempting or planning to transfer an individual with an emergency condition but for actually transferring such an individual.

EMTALA prohibits a hospital from transferring an individual with an emergency medical condition which has not been stabilized unless certain conditions are met. 42 U.S.C. § 1395dd(c)(1). To prove a violation of EMTALA's transfer provision, the plaintiff must present evidence showing that: "(1) the patient had an emergency medical condition; (2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred; and (4) prior to transfer of an

unstable patient, the transferring hospital did not obtain the proper consent or follow the appropriate certification and transfer procedures." *Baber*, 977 F.2d at 883. In this case, the first two criteria are not at issue because Defendant does not dispute that the SJRMC staff treating Mr. Haceesa knew by April 28 that Mr. Haceesa suffered from an emergency health condition. However, the elements to prove failure to stabilize before transferring assume that the hospital did actually transfer the patient. Plaintiffs point to no authority and the Court is aware of none holding that a hospital can be liable under EMTALA for planning to transfer a patient. Accordingly, the Court will grant summary judgment for Defendant as to the transfer claim.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment **[Doc. 20]** is hereby **granted in part and denied in part**. Plaintiffs' claims for failure to stabilize and for inappropriate transfer are hereby dismissed.

**DATED** this 2nd day of June, 2000.

_____
MARTHA VAZQUEZ
U. S. DISTRICT JUDGE

Attorney for Plaintiffs:
James P. Lyle

Attorney for Defendant:
Robert J. Curtis